# THE STATE v. ROBERT STEWART, Appellant.

Division Two, May 16, 1919.

1. **HOMICIDE: Instruction for All Grades of Crime.** In cases of homicide instructions declaring the law on all grades of the crime to which the testimony is applicable should be given. If there is substantial evidence, though consisting of the testimony of defendant alone, showing a state of facts which, if true, would reduce the crime from murder to a lower grade of homicide, it is the court's duty to instruct upon that grade.

2. ———: ———: **Manslaughter.** Voluntary manslaughter, at the common law is the unavoidable killing of another without malice or upon a sudden quarrel or in a heat of passion.

3. ———: ———: ———: **In Fourth Degree: Heat of Passion: Self-Defense.** Within the purview of the statute (Sec. 4468, R. S. (1909) providing that every killing of a human being by the act, procurement or culpable negligence of another, which would be manslaughter at common law and which is not otherwise defined as manslaughter in some other degree, shall be deemed manslaughter in the fourth degree, the killing, if intentional and done in a heat of passion or upon reasonable provocation, without malice or premeditation, and under such circumstances as will not render the offense justifiable or excusable, is manslaughter in the fourth degree.

4. ———: ———: ———: ———: **Provocation.** To constitute reasonable provocation adequate to reduce an offense from murder to manslaughter, such facts must be present as are calculated to excite the passions beyond control, and in the mind of the average just and reasonable man stir up resentment likely to cause violence and danger to life, and such as would naturally tend to disturb and obscure the reason and lead to action from passion rather than judgment. One of the essentials of such provocation is evidence of personal violence on the part of deceased towards the defendant.

5. ———: ———: ———: **Malice.** Malice is presumed from the use of a deadly weapon, such as a pistol, and the burden is on the accused to repel this presumption unless the evidence of the killing shows its absence. Where the accused armed himself with a pistol with which he immediately thereafter shot and killed the deceased, it will be presumed that the malignant condition of the

State v. Stewart.

mind of the accused continued throughout the act to such an extent as to preclude an instruction for manslaughter.

6. ———: ———: **No Instruction for Manslaughter Authorized.** The facts in this case disclose no evidence of that sudden combat necessary to arouse the passions of defendant to the realm of reasonable provocation, but the evidence showing that he deliberately armed himself for a deadly encounter and sought the presence of his victim, no instruction for manslaughter in the fourth degree would have been justified.

7. ———: **Instruction on Self-Defense: All Law of Case: No Proper Exception.** A general allegation in the motion for a new trial that "the court gave illegal and improper instructions" is not sufficient to preserve for review a complaint that the court erred in not giving an instruction in regard to seeking or inviting a combat, or as to what would constitute the right of self-defense.

8. ———: **Instruction: Singling Out Evidence: Attentions to Defendant's Wife.** It is not error to instruct the jury that improper attentions by deceased to defendant's wife afford no excuse or justification for defendant shooting deceased. Such an instruction does not single out and give undue prominence to the testimony establishing such attentions. To aid the jury in reaching a correct conclusion the court may always direct their attention to particular facts in evidence.

9. ———: **Evidence: Visiting Defendant's Wife.** Testimony that deceased had visited defendant's wife in his absence from home, of which fact, if it existed, he had had knowledge several days before the homicide, should be excluded. Evidence of an adulterous relation is only admissible when discovery of the same by defendant is so near the homicide as to afford no time for the passions inflamed thereby to cool.

10. ———: **Dying Declaration: Competency.** Deceased's brother testified that two days before deceased died, he was sitting on his bed and asked him: "Walter, what do you think about having a dying statement taken?" to which deceased replied: "Do as you please, I have got to die," and then directed another to take his statement. *Held*, that a statement then written out and signed by deceased was made *in articulo mortis;* and although deceased could not be excluded on the sole ground that deceased did not realize that death was impending.

11. ———: ———: **Subject-Matter: No Objection.** Dying declarations are but forms of hearsay evidence, and objections to their subject-matter should be made when offered and proper exceptions saved to an adverse ruling, and if no objection is made except that they thereafter underwent a surgical operation, performed by two physicians in an effort to prolong his life, still the declaration

State v. Stewart.

are "illegal and improper evidence to go to the jury" a consideration of their subject-matter on appeal is precluded.

12. **PRACTICE:** Reply Statement to Jury by Prosecuting Attorney. The statute (Sec. 5231, R. S. 1909) contains no provision authorizing the prosecuting attorney to make a statement to the jury in reply to the statement made by defendant's counsel at the opening of the case, and such practice should be condemned; and while every reply statement, without regard to its contents, is not reversible error, yet when it contains matters prejudicial to defendant's rights, as in this case, it is reversible error.

*Held*, by WALKER, J., dissenting, that the prosecuting attorney's reply consisted of a statement of the testimony he proposed to offer in rebuttal to the evidence which defendant's counsel had stated would be offered by him, and such material testimony was in fact offered and was proper rebuttal, and to its introduction appellant's counsel does not complain; therefore, the reply was not prejudicial error.

Appeal from Pike Circuit Court.—*Hon. Edgar B. Wool-folk,* Judge.

REVERSED AND REMANDED.

*Pearson & Pearson* for appellant.

(1) The court committed error in not giving an instruction to the jury on manslaughter in the fourth degree. The testimony of defendant himself, and that of his daughter, Ruby Stewart, with reference to deceased picking up a rock, immediately upon defendant's arrival at the mail box; the evidence of witness Lohse, who saw from a distance deceased's raised arm in a position to hurl something; and the testimony of witness, Jarve Allison, that immediately upon defendant's arrival at the mail box, the deceased stooped down, as he says, to pick up his gloves, but defendant and daughter testified that it was to pick up a rock, disclose a typical case wherein an instruction on manslaughter in the fourth degree should have been given to the jury. State v. Bates, 239 Mo. 513; State v. Wilson, 242 Mo. 501; State v. Grugin, 147 Mo. 48, 62; State v. McKenzie, 102 Mo. 632; State v. Con-

ley, 255 Mo. 198. It made considerable difference, at the time, whether deceased was attempting to pick up a rock or a pair of gloves. That phase of the case, and that difference should have been presented to the jury, for its consideration, under a proper instruction from the court. (2) The court erred in giving Instruction No. Ten. In so doing, it singled out the lack of evidence of undue intimacy between deceased and the defendant's wife, and, unduly and improperly, made the impression on the jury that there was evidence from which they might find this to be a fact. This instruction was not only prejudicial, but it was vicious. By this instruction the court accentuated, in the minds of the jury, the facts stated by the prosecuting attorney, in his reply statement. From this instruction, in connection with the prosecuting attorney's reply statement, the jury could readily infer, that the defendant had no right to go to the mail box with the view of protecting his home, and the honor of his family; and that by so doing, he voluntarily entered into the difficulty; and therefore his plea of self-defense was of no avail to him. State v. Grugin, 147 Mo. 48, 62. (3) The court committed error in allowing the prosecuting attorney to make a reply statement. The law does not recognize, or countenance, a reply statement on the part of the State's attorney; and the subject matter of the reply statement in the instant case was vicious in the extreme. Sec. 5231, R. S. 1909; State v. Kennedy, 177 Mo. 116. (4) The court committed error in excluding evidence offered by the defendant of deceased's visit, and attempts to visit his home and his wife in his absence. This evidence was competent, for the purpose of showing the motive, reason and animus for defendant's going to the mail box, when he saw deceased going there to talk to his wife. The jury had a right to know why defendant went to the mail box; it also had a right to know the relations existing between the deceased and plaintiff's wife, or of such attentions as were shown and sought to be shown her on the part of the deceased. State v.

Grugin, 147 Mo. 48, 62. (5) The dying declaration was a self-serving statement, made on the part of the deceased, at the suggestion of a third party, one of the deceased's kinsmen. It was made at a time when all hope of life had not ceased on the part of the doctors attending deceased; nor his relatives; and at that time deceased had never been advised that he was going to die. The dying statement also contained improper and illegal evidence which the court allowed to go to the jury.

*Frank W. McAllister*, Attorney-General, *Henry B. Hunt* and *C. P. LeMire*, Assistant Attorneys-General, for respondent.

(1) Where there is no evidence of manslaughter in the fourth degree, failure or refusal to instruct thereon is not erroneous. State v. Weinhardt, 253 Mo. 637; State v. Tucker, 232 Mo. 1; State v. Wooley, 215 Mo. 620. Mere words or actions, not accompanied by an assault or some violence against the person, are insufficient to reduce the guilt of killing from murder to manslaughter in the fourth degree. State v. Barret, 240 Mo. 169; State v. Starr, 38 Mo. 277. (2) Under the facts in this case, Instruction 10, given by the court, states the law properly, and there is no error therein. State v. Vest, 254 Mo. 466; State v. Herrell, 97 Mo. 112; State v. France, 76 Mo. 684; State v. Holme, 54 Mo. 164; Maher v. People, 10 Mich. 212; 21 Cyc. 751. (3) Although somewhat unusual to permit the prosecuting attorney to make a reply statement, yet there is nothing prejudicial to this defendant therein contained; therefore, said irregularity furnishes no basis for reversal. State v. Kennedy, 177 Mo. 116; State v. Brown, 247 Mo. 730; State v. Hess, 240 Mo. 160. (4) The trial court did not err in refusing to permit defendant to introduce evidence showing that deceased had visited the wife of defendant in her home on occasions when defendant was absent. State v.

Vest, 254 Mo. 466; State v. Grugin, 147 Mo. 48, 62; State v. France, 76 Mo. 684; Maher v. People, 10 Mich. 212. (5) Under the facts in this case, the written statement of Walter Allison was admissible as a dying declaration. State v. Kilgore, 70 Mo. 546; State v. Chambers, 87 Mo. 406; State v. Nelson, 101 Mo. 464; State v. Gibbs, 186 S. W. 986.

WILLIAMS, P. J.—An opinion was originally prepared in this case by WALKER, J. All of that opinion was concurred in by the court with the exception of one paragraph thereof dealing with the question of the right of the prosecuting attorney to make a reply statement of facts to the jury at the beginning of the trial. It being therefore entirely unnecessary to redraft that portion of the opinion and the statement upon which all are agreed we will adopt that portion of the original opinion in this opinion. The portion thus adopted is as follows:

"Appellant was charged by information in the circuit court of Pike County with murder in the first degree. Upon a trial, he was convicted of murder in the second degree, and his punishment assessed at ten years in the Penitentiary. From this judgment he appeals.

"Walter Allison, the deceased, and the appellant were farmers living in the same neighborhood in Pike County. Allison was a single man, and the appellant was married, having a wife and children. For several months prior to the killing, deceased had been clandestinely meeting appellant's wife. Appellant, upon being informed of this fact, on the day preceding the killing, requested the deceased to desist in his attention to his wife. This the deceased promised to do. On December 23, 1916, deceased, in company with Arvie Allison, his nephew, went to some mail boxes on a highway in the neighborhood, one of which belonged to the deceased and another to the appellant. They found the wife and daughter of the appellant at the mail boxes waiting for

the arrival of the carrier. The testimony of the State is that upon their arrival, they were greeted by the two women, the wife saying that she was not supposed to speak to them. Looking across an adjoining field, she saw her husband coming rapidly towards them, and said: 'Here comes Bob. There is going to be some trouble.' Reaching the scene of the killing, he spoke roughly to the deceased. Just at this juncture, the deceased reached down to pick up his gloves, when the appellant, with an oath, began shooting at him. At the first shot, which took effect, the deceased attempted to straighten up, but at the second, he fell, saying, "Bob, you have killed me.' Appellant, at this juncture, turned and walked away, accompanied by his wife and daughter. The nephew of the deceased, assisted by others, conveyed the latter, who was not then dead, to his home, where he died.

"For the defendant, a witness named Lohse testified that from his home, one hundred feet or more from the mail boxes, he saw the killing; that the deceased, when the appellant approached, had his left hand turned back, as though about to throw something. At this juncture, appellant fired the first shot; that the attitude of the appellant had not changed when the second shot was fired; that the pistol with which the shooting was done belonged to this witness, and immediately after the killing he went down and got it from the appellant, went to his house, and telephoned for help, and returned a few minutes later to where the deceased was lying in the road and assisted in conveying him to his home; that on one occasion prior to the shooting, he had discussed with the appellant the intimacy of the latter's wife and the deceased.

"The fifteen-year-old daughter of the appellant stated that when her father came up and asked the deceased why he had not complied with his promise, the latter picked up a stone to throw it, saying, with an oath, 'I will smash your brains out.'

"The appellant's testimony, material to the matters at issue, is substantially as follows: Upon seeing the deceased and his nephew leave the former's home and go down to the mail boxes, he went to his house, put a pistol in his pocket, and went across the field to the mail boxes. Approaching them, he said to the deceased: 'What did you promise me about my family yesterday?' That the deceased replied with an oath: 'I will smash your brains out,' and picked up a stone lying in the road. In the meantime, the appellant drew his pistol, and before deceased could throw the stone, he shot him. At the first shot, the deceased threw the stone on the ground, and it rolled almost to the appellant's feet; that the deceased then reached his hand towards his hip pocket, when the appellant fired the second shot and deceased fell to the ground; they were some ten or twelve feet apart when the shots were fired; that appellant then climbed over the fence, and with his wife and daughter, went down the road to the home of an uncle. The next morning he went back, and got the stone which he states deceased had tried to throw at him; and it was introduced in evidence as being the one in question.

"The instructions as to the grade of the crime were limited to murder in the first and second degrees and self-defense.

"I.     Error is assigned in the failure of the trial court to give an instruction for manslaughter in the fourth degree. The testimony, if this contention is sustained, must bring the case within the purview of Section 4468, Revised Statutes 1909, **Manslaughter.** which, so far as pertains to the case at bar, provides that every killing of a human being by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not otherwise defined to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree.

"Voluntary manslaughter at the common law is the unvoidable killing of another without malice or upon a sudden quarrel, or in a heat of passion. [Hale's P. C. 449; 1 Bl. Com. 191.]

"Where the killing is intentional, as contemplated by the statute cited, manslaughter in the fourth degree, under our rulings, is defined to be the killing of a human being in a heat of passion on reasonable provocation, without malice or premeditation, and under such circumstances as will not render the offense justifiable or excusable. [State v. Sebastian, 215 Mo. 1. c. 80 and cases.]

"It is elemental that in the giving of instructions in cases of homicide, it is the duty of the trial court to declare the law upon all grades of the crime to which the testimony is applicable. If, therefore, substantial evidence has been adduced in this case, although it may consist of the defendant's testimony alone, showing a state of facts, which if true, would reduce the grade of the crime, it was the duty of the court to instruct the jury upon the grade thus shown. [State v. Heath, 221 Mo. 1. c. 581.]

"The testimony to support the appellant's contention as to his right to the instruction for manslaughter in the fourth degree is that the deceased, with an opprobrious oath, said he would smash appellant's brains out, and picking up a stone, attempted to throw it at appellant, whereupon the latter drew a pistol and shot the deceased through one of his legs, who fell to the ground, letting the stone drop at appellant's feet. Appellant followed this up with another shot, inflicting the wound from which death resulted. Whatever may be the variant facts, under which instructions for manslaughter have been given in the different cases, it must appear, to authorize same, that there was reasonable provocation for the act of the accused.

"As to what constitutes reasonable provocation adequate to reduce the offense from murder to manslaughter is defined in State v. Conley, 255 Mo. 185,

as such a state of facts as is calculated to excite the passions beyond control, and in the mind of the average just and reasonable man stir up resentment likely to cause violence and danger to life, and such as would naturally tend to disturb and obscure the reason and lead to action from passion rather than judgment. This probably is as general a definition as can be well given. One of the essentials of such provocation is evidence of personal violence on the part of the deceased towards the defendant. Reasoning from analogous cases, while not wholly satisfactory, will enable a conclusion to be formed as to whether this essential is present in the case at bar to such an extent as to authorize the giving of the instruction for manslaughter.

"We held in State v. Barrett, 240 Mo. 1. c. 169, where the evidence showed that the deceased was advancing upon the defendant with a stick or club in his hand in a threatening manner at the time the shots were fired, that this did not constitute such an assault by the deceased as amounted to personal violence.

"In State v. Sharp, 233 Mo. 1. c. 290, although there was much conflict in the testimony, it was shown that the shooting commenced, which resulted in the killing, upon an officer in citizen's clothes drawing a pistol upon the defendant. In refusing the instruction for manslaughter in the fourth degree, the court held that there was no such personal violence offered to the defendant as to constitute such reasonable provocation as would authorize an instruction for manslaughter in the fourth degree.

"In State v. McKenzie, 228 Mo. 1. c. 396, 404, the deceased rushed at the accused with a large butcher knife; whereupon, the accused backed up against a door, and failing to get it open, drew a revolver and shot the deceased. It was held that these facts did not authorize the giving of an instruction for manslaughter in the fourth degree.

"In State v. Gordon, 191 Mo. 120, 125, the deceased, who was a much larger man than the accused,

caught the latter, and pressed him to his body and began to choke him. While in this position, the defendant pulled a knife out of his pocket and cut the deceased, in order to liberate himself. The wounds inflicted proved fatal. It was held that these facts did not reduce the killing to the grade of manslaughter.

"In State v. Gartrell, 171 Mo. 1. c. 520, it was shown that the deceased, after the use of opprobrious and insulting epithets, advanced on the accused with an iron wrench, when the latter struck him with the pole of an ax and killed him. These facts were held not to authorize the giving of an instruction for manslaughter in the fourth degree.

"In State v. Sumpter, 153 Mo. 436, the accused testified that he went into the field where the deceased was plowing and rode up to him, when the deceased said: 'Didn't I tell you I was going to kill you?' That the deceased thereupon stopped his team, wrapped his lines around the plow handles, and started towards the defendant with an ax, who shot him. The court held that an instruction for manslaughter in the fourth degree was unauthorized.

"In State v. Meadows, 156 Mo. 114, 116, a number of witnesses testified that the accused started away, when the deceased fired at him, and was in the act of firing a second time when the accused turned and shot him. The court held that an instruction for manslaughter in the fourth degree was not appropriate, in that the defendant was guilty of murder either in the first or second degree, or that the killing was done in the necessary defense of his person. Instructions as to the grade of the crime were given in each of the cases above cited, as in the Meadows case. Upon this theory, the trial court declared the law in the case at bar. The other attendant facts which must be considered as a part of and hence explanatory of the killing, lend support to the correctness of this conclusion.

"Bad blood existed between the parties, at least on the part of appellant against the deceased immediaely preceding the killing.

"Other than the sight of the deceased at the mail boxes with appellant's wife and daughter, there existed no cause for that heat of passion suddenly aroused on the part of appellant which is a precedent condition to that reasonable provocation necessary to the existence of manslaughter in the fourth degree. On the contrary, the appellant, with that calculation characteristic of a more serious grade of homicide, went deliberately to the scene of the crime and began to upbraid the deceased, and the latter attempted the assult—to the testimony of which we give credence for no other reason than that appellant may have whatever benefit may arise from same in the giving of instructions. There is here no evidence of that sudden combat necessary to arouse the passions of the appellant to the realm of reaonable provocation. In its stead, we find him deliberately arming himself for deadly encounter, seeking the presence of his victim, and as the evidence justifies us in saying, baiting the latter with words, that some act of his may at least afford superficial excuse for the use of the weapon, conveniently at hand. The procuring of the weapon by the accused gives ground for the presumption that it was in preparation for the commission of the crime. [State v. Sharp, 233 Mo. 269.] These facts afford no proof of the presence of any element sufficient to authorize the giving of the instruction asked. Furthermore, the appellant's conduct immediately preceding the killing is clearly indicative of such a malign condition of mind as to preclude the giving of the instruction. There is no controversy as to the fact that the pistol used was a deadly weapon. That a weapon is deadly may be inferred from the fact that it produces death although there is no evidence of its quality or dimensions. [State v. Bowles, 146 Mo. 6.] The ordinary result of the use

of such a weapon raises a presumption of malice and shifts the burden of proof to repel the inference of same to the accused, unless the evidence proving the killing shows its absence. There was no evidence of this character. [State v. Bauerle, 145 Mo. 1; State v. Evans, 124 Mo. 411; State v. McKinzie, 102 Mo. 620; State v. Fairlamb, 121 Mo. 137; State v. Elliott, 98 Mo. 150; State v. Crawford, 115 Mo. 620.]

"Actuated by malice in arming himself with the pistol, his immediate subsequent acts justify the presumption of the continuance of this state of mind. [Gunter v. State, 110 Ala. 24; Holland v. State, 12 Fla. 117; State v. Johnson, 23 N. C. 354.] In the presence of malice, there is no room for manslaughter. [People v. Borgetto, 99 Mich. 336; Jackson v. State, 74 Ala. 26; People v. Waysman, 81 Pac. (Cal.) 1087; State v. Tilly, 3 Ired. (N. C.) 424; State v. Johnson, 23 N. C. 354, 35 Am. Dec. 742.]

"The cases, therefore, of which that of Heath, supra, is a type, however definitely they may announce the doctrine that, upon the testimony of a defendant alone, an instruction for manslaughter is authorized, do not mean that where all the attendant facts show a higher grade of homicide or unqualified self-defense, that an instruction shall be given as is here insisted upon. [State v. Myers, 221 Mo. 598; State v. Barker, 216 Mo. 532.] In this connection it may be appropriately stated that even in the presence of that provocation claimed to have existed at the time of the killing this does not disprove malice. It only removes the presumption of same which the law raises without proof. If, therefore, a deliberate purpose on the part of appellant to kill the deceased has been shown by his immediate antecedent acts, the provocation insisted upon as existing at the time of the fatal shot must be disregarded unless it has been shown that this purpose was abandoned before the killing. There was no such showing. The reason for the rule stated is, that where provocation intervenes between the manifestation of malice

and the killing, the presumption is that the crime found its moving impulse in malice and not in the passion produced by the provocation. [Reg. v. Kirkham, 8 Car. & P. 115; State v. Johnson, 23 N. C. 354; State v. Ta-cha-na-tah, 64 N. C. 618.]

"II. The giving of an instruction in regard to one seeking or inviting a combat, and as to what would constitute the right of self-defense, is complain-
Saving
Exception. ed of. This alleged error is attempted to be preserved by a general allegation in the motion for a new trial, 'that the court gave illegal and improper instructions.' This, as we have repeatedly held, is not such a preservation of the error as to entitle it to our consideration. [State v. Crofton, 271 Mo. l. c. 514; State v. Pfeifer, 267 Mo. l. c. 28.]

"III. Error is assigned in the giving of the following instruction: 'The court instructs the jury that even though you may find and believe from the evidence in the cause that deceased, Walter Allison,
Comment on
Evidence. had been paying defendant's wife improper attentions, still such facts if true would afford no excuse or justification for defendant shooting and killing the deceased, Walter Allison.'

"The reason urged in support of this contention, in the language of appellant's counsel, is that the instruction complained of 'improperly singled out the evidence or the lack of evidence of the undue intimacy between the deceased and defendant's wife, and unduly and improperly brought this evidence of fact or the lack of it, to the attention of the jury by giving said instruction, and in particular referring to this evidence, to the prejudice of the defendant.'

"The language of the instruction does not sustain what is evidently meant by this condition, viz.: that the trial court erred in singling out or giving improper prominence to the testimony referred to. While it is true that a trial court cannot properly comment on the

evidence or tell the jury what presumption or conclusion should be drawn from any particular fact, it may, to aid the jury in reaching a correct conclusion, direct their attention to particular facts in evidence. This was all that was done in this instance. There was evidence brought out principally by appellant, of the existence of the alleged relation. The instruction correctly stated the law in regard to the same as constituting, under the facts, no defense to the crime. [State v. Privitt, 175 Mo. 1. c. 218.] Unless it had been given, the jury would have been left without a guide in this respect. The instruction was, therefore, permissible as constituting a proper direction to the jury. Furthermore, the instruction does not assume the existence of the fact of which complaint is made, but being drawn hypothetically leaves the determination of the same to the jury, to say whether or not it existed. As to its form, therefore, the instruction is not subject to criticism, and the appellant has, in this regard, no ground of complaint.

"IV. There was no error in excluding testimony to show that deceased had visited the wife of appellant in the latter's absence from home. The evident purpose of this testimony was to cast the shadow of an adulterous relation having existed between the deceased and the appellant's wife as affording a mitigating circumstance in the commission of the crime.

Adulterous Relation.

"Evidence of an adulterous relation, in a case of the character of that at bar, is only admissible when the discovery of the same by the aggrieved spouse is so near the homicide as to afford no time for the passions thus inflamed to cool. [State v. Privitt, 175 Mo. 207; State v. France, 76 Mo. 1. c. 685; Biggs v. State, 29 Ga. 725.]

"The adulterous relation, if it existed, was in the past and appellant had knowledge of it at least several

days before the homicide. His motive, therefore, whatever it may have been, in going to the mail boxes could afford no defense to his crime. Consequently, the claim that the evidence was competent for the purpose of showing motive, reason and animus is without merit. Under the facts in State v. Grugin, 147 Mo. l. c. 48, cited by appellant, it is not an authority for the contention here made, and we overrule the contention.

"V. It is insisted that error was committed in the admission in evidence of the dying declaration, which had been written out at the dictation of the deceased and signed by him.

"Dying declarations are but a form of hearsay evidence. Our review of same is consequently subject to the same regulations applicable to other testimony concerning which the rulings of the trial court Dying Declaration. are assailed. If, therefore, we find that the objections to the declaration have not been properly made or preserved, so as to present a live record of same, they will not be entitled to our consideration.

"Preliminary thereto, it is not inappropriate to say that there is no merit in the objection to the declaration that it was not made in *articulo mortis,* with a full realization on the part of declarant of his impending dissolution.

"This is the testimony of the latter's brother in that regard: 'Well, I just went to him, I was sitting on the bed, and I went up to him and asked him, I said, "Walter, what do you think about having a dying statement taken?" and he said, "Do as you please, I have got to die," and told Mr. Hawkins to go ahead and take his statement, and that was all that was said.'

"Declarant's statement as to his realization of his condition was made on December 27th. On the 29th he died. No qualifying facts or modifying statements lessen the cogency of this statement. Its probative force is sufficient to authorize the admission of the decla-

ration on the ground that the deceased realized that
death was impending. [State v. Thomas, 189 S. W.
(Mo.) 886; State v. Lewis, 264 Mo. 420; State v. Vest,
254 Mo. 458; State v. Finley, 245 Mo. 465; State v.
Dipley, 242 Mo. 461.]

"That the extent of the appellant's objections to
the admission of the declaration may be clearly shown,
we set them out in full: 'Mr. Ras Pearson, counsel for
appellant: Well, we object. Sufficient showing has not
been made to render it [the declaration] competent.
Several of the essentials necessary to render such a
statement competent have not been shown.'

"After a statement by the court on its own motion,
that it would exclude from the jury certain matter in
the declaration, and admit same as modified, counsel for
appellant further objected as follows: 'Mr. Ras Pear-
son: We object to the declaration because a sufficient
showing has not been made, and particularly they hav-
en't shown that the deceased, Walter Allison, was in
a condition that his mind was such to comprehend what
he was doing at the time; that he realized what he was
doing; and that he had mentality enough to comprehend
what he was doing; and that the mere statement of the
witness doesn't show that all hope was abandoned be-
cause he went on the operating table in two days after-
wards, and I take it that a doctor would not have put
a man on the table when there was no hope and no
prospect of doing any good, or doing the patient any
good, and we can at least indulge in the belief that
these doctors—though perchance they might save this
man's life by taking him through an operation; at
least, in this case we have their acts and deeds—by
medical skill and medical science might prolong a life,
and no one, save and except the deceased, who says
there was no show for him to live.' After an interrup-
tion by the prosecuting attorney, counsel for appellant
continued his objection as follows: 'Mr. Ras Pearson:
He goes on the operating table the next night or two days
afterwards. It still shows they had some hope of pro-

longing his life. He doesn't show that the deceased at the time he made that dying declaration had abandoned all hope, and that he was going to die, the essentials of which are necessary to make that statement competent.'

"Upon the ruling of the court that the declaration, as limited, would be admitted, counsel for appellant continuing his objections, said: 'Mr. Ras Pearson: I think the proof is too scant to put a layman on the witness stand and make the declaration. Now, this deceased had two doctors, and they were there daily, and if there is ground for a dying statement to be offered, it ought to be admitted with more solemnity, and this is not the best proof; not sufficient proof, and on that ground I object and save my exceptions.' Whereupon, the declaration was admitted in evidence.

"The burden of appellant's objections to the admissibility of the declaration is based on the ground that it was not sufficiently made to appear that the declarant realized that he was *in articulo mortis*. Neither from the express terms of these objections or by reasonable implication can their meaning and purpose be extended beyond this. Under the well established and often repeated rule, therefore, that objections to matters occurring during the trial should be made at the time of their occurrence and proper exceptions preseved, we are limited in the consideration of the admissibility of this declaration to the objections made thereto. Certainly if counsel for appellant had desired that other objections should be entertained, they would have been preserved in a manner to entitle them to our consideration. That this was not their purpose is evident from the motion for a new trial, which simply states: 'The court improperly admitted in evidence the dying declaration of the deceased, Walter Allison, and thereby permitted improper and illegal evidence to go to the jury.' The meaning of this motion, although general in its terms, must be limited to the specific objections made in the record itself. Thus construed, it

preserves nothing for our review except that expressly authorized by the record. '

"No question is involved here as to the general or specific nature of objections to the introduction of testimony, because there is no objection interposed other than that indicated. A consideration, therefore, of the subject-matter of the declaration is precluded, and we overrule this contention."

VI. It is further contended by appellant that the court erred in permitting the prosecuting attorney to make a reply statement to the jury. At the beginning of the trial the State made its opening statement to the jury. The defendant likewise made a statement of the case to the jury. After the defendant's counsel had made his statement of facts to the jury the prosecuting attorney, over the objection and exception of the appellant, was by the court permitted to make the following reply statement to-wit:

**Statement to Jury: Reply of Prosecuting Attorney.**

"In reply to Mr. Pearson's statement with reference to the character that he says he will show that Walter Allison bore, I want to say there is but one incident of that; I think the evidence will show you that Walter Allison was not in conflict with the State law, nor did he bear any such turbulent reputation or any such aggressiveness as Mr. Pearson would have you understand. We will show you, gentlemen, in respect to the evidence that Mr. Pearson says he will introduce here showing you that Walter Allison invaded the home of this defendant, we will show you that this defendant's wife was urging Walter Allison, and that he was not the aggressor in that, if his home was invaded, but we will show you by letters in her own handwriting that she sought to have Walter Allison come there and sought his company, and we expect to show and prove to you gentlemen, by the evidence in this case, that in the conversation Mr. Pearson told you that wherein this defendant told Walter Allison he didn't

want him to have anything more to do with his wife, Walter Allison said, 'All right, Bob, I will let her alone, but I want you to make her let me alone.' And we expect to show, gentlemen, following after Walter Allison was shot in the leg, that he was unable to move from that time, to move from his tracks, and couldn't have made the advance towards this defendant that Mr. Pearson told you that the evidence would show you. We expect to show you, gentlemen of the jury, that there was not a weapon upon Walter Allison's person at the time, and we expect to show you by evidence, good and strong, gentlemen of the jury, there was no rock in Walter Allison's hand; upon the other hand, there may have been gloves that they seek to turn into a rock.''

Section 5231, Revised Statutes 1909, makes it mandatory upon the part of the prosecuting attorney to first make a statement of the case to the jury. No authority is to be found authorizing the prosecuting attorney to make a statement in reply to the statement which the defendant is permitted to make.

In the case of State v. Kennedy, 177 Mo. 98, l. c. 166-117, a situation very analogous to the one now presented was discussed and the above statute construed. In that case it was held that the remarks made by the prosecuting attorney in a reply statement were prejudicial and that the same constituted reversible error.

We are of the opinion that the remarks of the prosecuting attorney in his reply statement in the case at bar were as prejudicial in their nature as were the remarks which were condemned in the Kennedy case, supra, and for the reason there given the same should be held to be reversible error.

We are not here saying that every reply statement of a prosecuting attorney without regard to its contents and without regard to whether the statement made contained or did not contain matters prejudicial to defendant's rights, would constitute reversible error. The practice, however, should be condemned and not encouraged.

What remarks, if any, a prosecuting attorney could make in a reply statement of the case to the jury without committing reversible error, we are not here called upon to determine. It is sufficient for the purpose of this case to say that the present statement was sufficiently prejudicial to cause a reversal of the case.

The judgment is reversed and the cause is remanded.

PER CURIAM:—The foregoing opinion is adopted as the opinion of Court in Banc. *Faris, J.,* concurs; *Blair* and *Graves, JJ.,* concur in Paragraphs I, III, IV and VI, and the result; *Walker, J.,* dissents in a separate opinion; *Bond, C. J.,* not sitting; *Woodson, J.,* absent.

WALKER, J. (dissenting.)—I do not concur in the conclusion reached in the majority opinion as to the alleged error in permitting the prosecuting attorney to make a reply statement to the jury, preliminary to the trial.

It appears from the record that the prosecuting attorney stated to the court that he understood that he would not be permitted to make a reply statement. Upon associate counsel insisting that the State should be permitted to reply to extraneous matter, counsel for appellant stated his grounds of objection thereto. Subsequently, upon a renewal of the request by the prosecuting attorney, the court permitted the reply statement to be made, to which timely objections were interposed.

That portion of the statute (Sec. 5231, R. S. 1909) defining the procedure in regard to the statement of counsel in criminal cases preliminary to the introduction of testimony, is as follows: "The jury being impaneled and sworn, the trial may proceed in the following order: first, the prosecuting attorney must state the case and offer the evidence in support of the prosecution; second, the defendant or his counsel may then state his defense and offer evidence in support thereof.". . .

The form of the statute, so far as concerns the course to be pursued by the prosecuting attorney, is mandatory. Construed under the rule of *expressio unius,* therefore, his right was limited to an opening statement. That the law contemplates the enforcement of this limitation as a part of the regular order of procedure, there is but little question, and a failure to observe the requirement is not to be commended. However, appellant's contention, to afford ground for reversal of the judgment, must take deeper root than is afforded by the form of the statute. It must not only, in reason, and in furtherance of a wholesome administration of the criminal law, appear, on account of the court's ruling, that the appellant suffered some substantial injury. The prosecuting attorney's reply consisted of a statement of the testimony he proposed to offer in rebuttal to the evidence which it had been stated would be introduced by the appellant, a portion of which was in regard to the relations, which had been sustained, between the latter's wife and the deceased. While much of the testimony proposed to be introduced by counsel on each side, in regard to these relations, was wholly irrelevant, and was subsequently excluded when offered, the main portion of the evidence proposed to be offered in the reply statement consisted of material facts which were actually introduced in evidence, and were proper in rebuttal. To the introduction of same, counsel for appellant does not complain. He should not be heard, therefore, to complain of the statement of its proposed introduction. The plea, therefore, as to the injury arising from the reply statement is specious rather than real. It will be found upon an examination of the facts in the case of State v. Kennedy, 177 Mo. l. c. 117, that the ruling there made as to the impropriety of the reply statement made by the prosecuting attorney was as to the prejudicial character of same, and not to the fact that it was unauthorized by the statute. No fault is to be found with that ruling, the reason of which is in accord with the

conclusion we have reached · herein and hence does not support appellant's contention.

We are, therefore, of the opinion that no prejudicial error was committed in permitting the prosecuting attorney to make a reply statement, and that the judgment of the trial court should be affirmed.